NGUYEN, Circuit Judge, dissenting: The majority applies the wrong standard of review, creating a circuit split in the process, and with undue deference to the Bankruptcy Appellate Panel’s (“BAP”) erroneous decision, affirms it. When a case involves undisputed facts and the only issue is the legal conclusion to be drawn from those facts, review is de novo. As for the substantive law, it’s clear: When you take out a loan to buy property at which you plan to reside for at least two years without renting it out or otherwise profiting from it, the loan is consumer debt. I therefore dissent. I. According to the majority, “whether Cherrett incurred the Housing Loan primarily for a business purpose” is an “essentially factual” dispute. Maj. Op. at 1066-67. That simply isn’t true. The parties agree that there are no factual disputes, including Cherrett’s subjective intent in obtaining the Housing Loan. Compare Aspen’s Opening Br. at 7 (asserting that “[t]he only facts found to be relevant by any prior court are undisputed” while acknowledging Cherrett’s contention “that other, undisputed facts ... are also relevant”), with Cherrett’s Br. at 6 (“None of the facts in this case are in contention.... Aspen has not asserted that any mistake was committed by the Bankruptcy Court in its findings of fact.”). What the parties contest is whether these undisputed facts—including, to the extent relevant, Cherrett’s various reasons for obtaining the Housing Loan—render the Loan “debt incurred by an individual primarily for a personal, family, or household purpose.” In re Kelly, 841 F.2d 908, 912 (9th Cir. 1988) (quoting 11 U.S.C. § 101(8)). Kelly held in no uncertain terms that when “the underlying facts are not disputed,” the question of “whether [a particular debt] qualifies as a ‘consumer debt’ under” the Bankruptcy Code “is one in which legal issues predominate and is thus subject to de novo review.” Id. As a three-judge panel, we aren’t free to disregard our prior holdings. See Miller v. Gammie, 335 F.3d 889, 899 (9th Cir. 2003) (citing the “unassailable” proposition “that a three-judge panel may not overrule a prior decision of the court”). Not only that, it’s beyond debate that “where no facts are in dispute our entire review is de novo.” Norcia v. Samsung Telecomms. Am., LLC, 845 F.3d 1279, 1283 (9th Cir. 2017) (quoting Davis v. Nordstrom, Inc., 755 F.3d 1089, 1091 (9th Cir. 2014)); see also In re Crawford, 194 F.3d 954, 957 (9th Cir. 1999) (“Because the relevant facts here are undisputed, our review focuses on the bankruptcy court’s legal conclusions, which are subject to de novo review.”). This firmly settled standard is an outgrowth of the principle, fundamental to Anglo-American jurisprudence, that “it is the province of the trial court to decide questions of fact, [and] of the appellate court to decide questions of law....” Reay v. Butler, 95 Cal. 206, 30 P. 208, 209 (1892); see Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 501, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (recognizing “an appellate court’s power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law”); Wiscart v. D’Auchy, 3 U.S. (3 Dall.) 321, 329, 1 L.Ed. 619 (1796) (“[T]he law directs that in cases of appeal, part shall be decided by one tribunal, and part by another; the facts by the court below, and the law by this court. Such a distribution of jurisdiction has long been established in England.”); cf. In re McLinn, 739 F.2d 1395, 1400 (9th Cir. 1984) (en banc) (rejecting as “unsound” the “assumption that the district judge has some particular knowledge or experience in the field of law in issue that is to be given great weight apart from the authorities presented by the parties or articulated by the district judge”). This principle is, for example, the reason why “[djecisions of the BAP are reviewed de novo.” Maj. Op. at 1064 (quoting In re Su, 290 F.3d 1140, 1142 (9th Cir. 2002)). The BAP acts in an appellate capacity, deciding questions of law based on facts determined in the bankruptcy court. Because we also review legal questions de novo, it makes no difference whether we formally review the BAP’s determinations or the bankruptcy court’s, for “we are in as good a position as the BAP to review bankruptcy court rulings.” In re Findley, 593 F.3d 1048, 1050 (9th Cir. 2010) (quoting In re Taggart, 249 F.3d 987, 990 (9th Cir. 2001)); see In re Burley, 738 F.2d 981, 986 (9th Cir. 1984). “[B]ecause the application of law to fact will generally require the consideration of legal principles, ... most mixed questions will be reviewed independently,” i.e., under a de novo standard. United States v. McConney, 728 F.2d 1195, 1204 (9th Cir. 1984) (en banc), abrogated on other grounds by Pierce v. Underwood, 487 U.S. 552, 557-63, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). An “application of the rule of law to the facts” is an “essentially factual” inquiry if it is “founded ‘on the application of the fact-finding tribunal’s experience with the mainsprings of human conduct,’ ” id. at 1202 (quoting Comm’r v. Duberstein, 363 U.S. 278, 289, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960)), or if “some of the elements that bear upon [the legal question] may be known only to the district court,” Pierce, 487 U.S. at 560, 108 S.Ct. 2541. That isn’t the case here. Like the BAP, we are determining whether certain agreed-upon facts fall within a statutory definition. Nor is this a case that involves “a multifarious and novel question, little susceptible ... of useful generalization,” id. at 562, 108 S.Ct. 2541. The majority isn’t publishing our decision today because of its importance to Cherrett—though he will undoubtedly be relieved to avoid his debt obligation. Rather, the majority understands that other debtors will find themselves in similar circumstances and will need guidance as to the legal characterization of their debt. The majority asserts that “[c]ourts are split on this standard of review.” Maj. Op. at 1067 n.3. They aren’t, aside from the wayward Eighth Circuit BAP decision that the majority cites. Every circuit (including our own in Kelly) to review a bankruptcy court’s ruling on whether a particular obligation is “consumer debt” has done so de novo. The majority acknowledges two such cases; In re Stewart, 175 F.3d 796, 803 (10th Cir, 1999), and In re Booth, 858 F.2d 1051, 1053 n.5 (5th Cir. 1988). There are others. See In re Westberry, 215 F.3d 589, 590 (6th Cir. 2000) (“The issue presented here, whether federal income taxes should be considered consumer debt for purposes of 11 U.S.C. § 1301, is a question of law, which we review de novo.”); In re Runski, 102 F.3d 744, 745, 747 (4th Cir. 1996) (“determining whether debt is for ‘personal, family, or household purposes’ under § 101(8)” to “aid in determining the proper meaning of the nearly identical language found in § 722” and appearing to treat the question as a matter of statutory construction, “subject to plenary review”). Today the majority needlessly creates an intra- and inter-circuit split.[1] II. “It is difficult to conceive of any expenditure that serves a ‘family ... or household purpose’ more directly than does the purchase of a home.... ” Kelly, 841 F.2d at 913. The condo that Cherrett purchased with the Housing Loan may not have felt to him like a “home” in an emotional sense given that his wife and children were living in a different state for much of the time. That Cherrett’s heart was in Wyoming shows only that his Colorado condo may not have been his legal domicile, ie., that “true, fixed, principal, and permanent home, to which [a] person intends to return and remain even though currently residing elsewhere.” Domicile, Black’s Law Dictionary (10th ed. 2014). It was, however, his “home” in the legal sense of being his “dwelling place,” Home, Black’s Law Dictionary (10th ed. 2014), or “principal residence,” 11 U.S.C. § 101(13A). A “temporary home” (as Cherrett described it), perhaps—but still a home. Cherrett intended to live there for at least two years. Cf. Stolk v. Comm’r, 40 T.C. 345, 356 (1963) (holding that New York apartment where taxpayer moved to be near his office was his “principal residence” for a year notwithstanding weekend and holiday trips to his Virginia farm where he and his wife planned to settle). I agree with the majority that the Housing Loan’s classification as consumer or non-consumer debt should be based on the purpose of the debt at the time Cherrett incurred it. And the majority properly rejects any contention that the debt was for a business purpose merely because Cher-rett expected eventually to profit from the “skyrocketing” housing prices in the Aspen area. In re Cherrett, 523 B.R. 660, 672 (9th Cir. BAP 2014). Virtually all homebuyers in certain regions of the country expect to profit when they sell their homes. But the majority conflates Cherrett’s purpose in moving to Colorado with his purpose in taking out the Housing Loan. The fact that he moved to Colorado primarily if not exclusively for business purposes proves too little. Under the majority’s analysis, a person could move her family across town in order to be closer to a new job and, if she takes out a home loan to finance her new residence, it would be for a business rather than a personal, family, or household purpose. It makes no difference that this hypothetical move is out of convenience and Cherrett’s was arguably out of necessity. A person’s primary purpose in making a decision isn’t dependent on the existence of alternative options. Moreover, how is a court even to determine whether it’s necessary to purchase a new home for work purposes? Here, for example, there’s no evidence that Cherrett needed to take a new job out of state. He made $225,000 a year in Wyoming and “was very happy in [his] position.” This line of reasoning ignores the statutory text. The statute defines “consumer debt” as “debt incurred by an individual primarily for a personal, family, or household purpose.” 11 U.S.C. § 101(8) (emphasis added). It is the purpose of the debt— ie., what the debt is used for—that matters. The debtor’s indirect purposes are irrelevant. Until now, this is the approach we have taken. See In re Price, 353 F.3d 1135, 1139 (9th Cir. 2004) (“Under Kelly, whether or not a particular secured debt is excluded from inclusion as ‘consumer debt’ under § 707(b) depends on the purpose of the debt.”). In Price, we explained that “Price’s personal residence was secured by two mortgages. The first .., [was] incurred to purchase the home; the second ... incurred to finance household improvements.” Id. Thus, there was “no question that the secured debt at issue was incurred ‘primarily for a personal, family or household purpose’ and must be considered ‘consumer debt’ for the purposes of § 707(b).” Id. We did not examine Price’s motivation for purchasing a personal residence and making improvements to it. The legislative history supports this interpretation.[2] Congress adapted the Bankruptcy Code’s definition of “consumer debt” from the consumer protection laws— in particular the Truth in Lending Act (“TILA”), 15 U.S.C. § 1602(i), which contains a similar definition. See In re Booth, 858 F.2d 1051, 1054 (5th Cir. 1988). Compare 11 U.S.C. § 101(8) (“The term ‘consumer debt’ means debt incurred by an individual primarily for a personal, family, or household purpose.”), with 15 U.S.C. § 1602(i) (“The adjective ‘consumer,’ used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes.”). For that reason, courts interpreting the Bankruptcy Code’s definition of “consumer debt” look to TILA and cases interpreting it. See Booth, 858 F.2d at 1054; In re Almendinger, 56 B.R. 97, 99 (Bankr. N.D. Ohio 1985). In determining whether a transaction is commercial or personal for the purposes of TILA, we generally consider the factors employed by the Federal Reserve Board under Regulation Z, 12 C.F.R. pt. 226 supp. I, subpt. A, § 226.3(a). See Bloom v. I.C. Sys., Inc., 972 F.2d 1067, 1069 (9th Cir. 1992), Crucially, “[c]redit extensions by a company to its employees” aie “consumer-purpose” loans under the regulations “if the loans are used for personal purposes.” Id. pt. 226, supp. I, subpt. A, § 226,3(a)(3)(iii)(A). That’s precisely the situation here. Aspen subsidized Cherrett’s condo loan, but the condo itself was used for a personal purpose—Cherrett lived there. “[D]ebt incurred to purchase the debtor’s principal residence ... is a ‘consumer debt’ under [11 U.S.C.] § 101(8).” In re Fadel, 492 B.R. 1, 15 (9th Cir. BAP 2013) (citing Kelly, 841 F.2d at 913); see also 15 U.S.C. § 1602(x) (defining “residential mortgage transaction” as “a transaction in which a ... consensual security interest is created or retained against the consumer’s dwelling to finance [its] acquisition”); cf. Slenk v. Transworld Sys., Inc., 236 F.3d 1072, 1076 (9th Cir. 2001) (looking to “the actual use to which [a] backhoe was put” in concluding that its financing was consumer debt under the similarly worded Fair Debt Collection Practices Act, 15 U.S.C. § 1692a(5), because “the backhoe was used strictly for personal use, and was never used by [the owner’s company]”). The majority theorizes that Cherrett’s debt is work-related because he incurred it as an incident of his employment; even though the loan money was directly used to purchase his residence, it was indirectly used as a means of extracting more income from his employer in the form of subsidized interest. The majority emphasizes that Cherrett could not have afforded to live close to his new job without this housing assistance. Maj. Op. at 1068-69. The Tenth Circuit rejected a similar argument about a loan’s ultimate purpose in Stewart. The debtor borrowed. $320,000 from his former in-laws, which “his ex-wife used ... to support their family, including use for house payments, groceries, preschool, children’s activities, moving expenses, and family vacations” while he pursued a medical degree so that he could earn more money for his family. 175 F.3d at 807. The Tenth Circuit concluded that “the main purpose of these loans was [not] to finance [the debtor’s] actual educational expenses. Rather, [he] used the money to support his family because he did not earn enough for his family to live comfortably.” Id. The Tenth Circuit also concluded that “a substantial portion of [the debtor’s $200,000 in] student loan debt is indeed ‘consumer debt’ ” because it “went toward his family’s expenses.” Id. In short, Stewart repudiated the idea that a loan could be for a particular purpose just because it indirectly facilitated that goal. To see the difficulties the majority’s analysis entails, one need look no further than the instant case. Cherrett’s purposes were several: He needed a place in Colorado to live and sleep when not at work or visiting his family in Wyoming. That’s a consumer purpose. Cherrett’s reason for being in Colorado was to take a new job, which is a business purpose. But the “primary driver” for Cherrett in accepting the new job was that he might “end up” in Jackson Hole with his family “for the mid to long term” if and when Aspen expanded its operations there. That’s a personal purpose. Under the majority’s holding, any of these purposes could have been found controlling. The characterization of Cherrett’s loan as business debt turned only on the whims of the bankruptcy court. The majority contends that this was not an “ordinary” home loan because Cher-rett’s employer “covered all of his annual out-of-pocket expenses related to its financing for the first ten years” so long as Cherrett remained in his job. Maj. Op. at 1069. That is enormously inaccurate. Aspen didn’t pay the interest that Cher-rett owed on the debt. Aspen merely compensated him for the interest payments that he was contractually obligated to make to the lender—a third party—on commercially reasonable terms.[3] Although from Cherrett’s perspective, Aspen’s bonuses made his obligation to make interest payments relatively painless, the two were legally unrelated. Home mortgage interest payments potentially reduce one’s tax liability, whereas the bonuses from Aspen increased Cherrett’s tax burden. For that very reason, Aspen provided Cherrett with additional compensation to cover most (but not all) of his assumed 35% tax liability on the bonuses.[4] This compensation for interest and taxes, a total of $33,750 per year, isn’t at issue. What’s at issue is Cherrett’s indebtedness on the loan. Cherrett wasn’t entitled to the housing compensation unless “[t]he proceeds of the loan [were] used to acquire [the] condominium.” And so. they were. The majority’s holding today does not help debtors so much as create massive uncertainty for lenders in gauging the riskiness of home loans, thereby imposing greater financing costs on homebuyers. The majority replaces Kelly’s straightforward standard—all loans to purchase a home are consumer debt—with an unworkable one that requires lenders to assess a homebuyer’s amorphous purposes in changing residences. Since lenders cannot easily make this determination, interest rates for all homebuyers will rise. Lenders unable to predict whether particular home-buyers can potentially abuse the bankruptcy process to write off mortgage debt will face higher risks for which they must be compensated. III. Properly classifying the Housing Loan as consumer debt would not preclude Cherrett from obtaining bankruptcy relief. “[T]he existence of primarily consumer debt alone does not result in dismissal under § 707(b), because the bankruptcy court must still make a finding of substantial abuse.” Price, 353 F.3d at 1139. This factual finding is based on a number of case-specific factors, and the bankruptcy court is appropriately afforded considerable discretion in making it. See id. at 1140. “Consequently, a debtor truly in need of a fresh start will not be subject to dismissal” just because the majority of his debt is a home loan. Id. at 1139 (citing Kelly, 841 F.2d at 913). I respectfully dissent. . There’s no reason for the majority’s oddly deferential approach. The majority acknowledges that it would reach the same result under de novo review. Maj. Op. at 1067. . To be fair, there is support in the legislative history that "consumer debt does not include a debt to any extent the debt is secured by real property.” 124 Cong. Rec. 32,393 (1978) (statement of Rep, Edwards). However, Kelly and “most [other] courts have declined to follow this legislative history and instead include home mortgages in the determination of whether a debtor has primarily consumer debts.” 6 Collier on Bankruptcy ¶ 707,04[2][b] (16th ed. 2017). , . The $500,000 note, secured by a second deed of trust in favor of Areljay, L.P., the lender, required interest payments at a rate of 5% per year during the loan’s 10-year term. Cherrett agreed to repay the principal at the end of the loan term or it would be subject to a 10% annual interest rate thereafter. . Cherrett was out of pocket about $3,000 per year in uncompensated taxes based on the assumed'tax rate of 35%.